[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10926

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ISAAC CAMON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

2                      Opinion of the Court                    24-10926

D.C. Docket No. 7:23-cr-00010-HL-TQL-1

_____

_____

No. 24-10928

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ISAAC CAMON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

D.C. Docket No. 7:23-cr-00021-HL-TQL-1

_____

Before LAGOA, ABUDU, and KIDD, Circuit Judges.

PER CURIAM:

Isaac Camon appeals his 72-month sentence based on his conviction after pleading guilty for wire fraud and the subsequent revocation of his supervised release. He argues that the government breached his written plea agreement because it stipulated to a loss amount of $19,452 for sentencing purposes, but later introduced evidence—both through his presentence investigative report ("PSI") and at sentencing—supporting a much greater loss amount. After careful review, we vacate Camon's sentence and remand for resentencing before a new judge.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

In February 2023, while completing his five-year term of supervised release for conspiring to distribute narcotics and possessing a firearm in furtherance of drug trafficking, a grand jury indicted Camon for wire fraud based on evidence that he fraudulently obtained unemployment benefits from the Georgia Department of Labor ("GDOL") in violation of 18 U.S.C. § 1343. Camon's probation officer petitioned the district court for an arrest warrant, alleging that he violated his conditions of supervised release by engaging in new criminal conduct. A warrant issued, and Camon was arrested.

That August, Camon entered a written plea agreement with the government to plead guilty to wire fraud. The agreement stated that the district court would consider its sentence in light of the Sentencing Guidelines and that, "at sentencing, [it] may

determine any pertinent fact by a preponderance of the evidence and . . . consider any reliable information." Camon acknowledged that the district court was not bound by any estimate he had received of the likely guideline imprisonment range, and that the district court would "not be able to determine the appropriate guideline sentence until after" the completion of a PSI. The plea agreement stated that nothing in it limited the district court's sentencing discretion. Camon further agreed that the written plea "constitute[d] the entire agreement between" him and the government, and that "no other promises or inducements" were made by the government regarding his guilty plea.

The agreement provided that the government accepted Camon's plea of guilty "in full satisfaction of all possible federal criminal charges known . . . at the time of [his] guilty plea, which might have been brought solely in this district against [him], except for the currently pending revocation of supervised release action." The government agreed to "recommend consecutive sentences for the revocation" and make "a non-binding recommendation for sentences at the bottom of each of the calculated guidelines ranges."

The agreement also contained a non-binding stipulation of facts, which described Camon's offense conduct as follows. In June 2020, while in federal custody, Camon filed a claim for unemployment insurance with GDOL, seeking unemployment funds that were established under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. In his application, Camon claimed to work for a freight company. In actuality, Camon never reported

any work income for tax purposes, was in custody during the time he claimed to be employed, and the company he claimed to work for had not been formed until after his claimed employment tenure. GDOL approved Camon's claim and provided him payments over the course of 2020 and 2021 which Camon used to make various purchases. The stipulated facts provided that the total amount paid out by GDOL was $19,452, of which Camon received $16,322.

Importantly, the stipulation also stated that "for purposes of relevant conduct used for calculating" Camon's guideline sentencing range, Camon was "accountable for an intended fraud loss totaling []$19,452." The plea agreement did not contain any other stipulations regarding relevant conduct for sentencing purposes. The agreement did contain a clause in which the government "expressly reserve[d] its right to furnish to the Court information, if any, showing that [Camon] has not accepted responsibility," but did not contain a clause in which the government generally reserved its right to inform probation or the district court of additional facts or information for sentencing purposes.

Camon pled guilty at a change of plea hearing and agreed that he could not rely on any estimates about his potential sentence based on the Sentencing Guidelines.

A probation officer then prepared a draft PSI and supervised release revocation summary. In its description of the offense conduct, the PSI restated the plea agreement's description of Camon's unemployment fraud, and, consistent with the stipulated facts,

concluded that he was accountable for an intended loss amount of $19,452.

The probation officer then recounted the following additional offense conduct that was not included in the indictment or stipulation of facts. At the same time Camon engaged in the above-mentioned unemployment fraud, he and an associate, Stephanie Paul, registered several fraudulent businesses, which, at Camon's direction, were used to defraud the U.S. Probation Office, the Small Business Administration ("SBA"), and GDOL. The PSI stated that Camon instructed Paul to verify to probation that he was employed by one of these companies while on supervised release, and that he also directed her to use them to apply for funds through the SBA's Economic Injury Disaster Loan ("EIDL") program. The PSI stated that the intended loss to the SBA could not be ascertained but concluded that the SBA suffered an actual loss of $97,400 in fraudulently obtained EIDL funds paid to Camon. The PSI calculated that Camon was responsible for a total fraud loss of $116,852 based on both the unemployment and EIDL fraud, but stated that, pursuant to his written plea agreement, he "shall only be held accountable for the intended loss of $19,452 suffered by the GDOL."

Based on Camon's wire fraud conviction, the PSI calculated a base offense level of seven pursuant to U.S.S.G. § 2B1.1(a)(1). Next, the PSI added four points pursuant to U.S.S.G. § 2B1.1(b)(1)(C) because the loss amount exceeded $15,000 but was less than $40,000. The PSI proceeded to apply a two-point sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10)(C)

because (1) Camon used fraudulently established businesses to de-fraud GDOL of unemployment benefits and defraud the SBA of EIDL funds, and (2) he furthered this scheme by directing Paul to verify his employment to probation. Pursuant to U.S.S.G. § 2B1.1(b)(12), the PSI applied another two-point enhancement be-cause the fraud involved major disaster or emergency benefits. Based on Camon's involvement of Paul in the fraud, the PSI ap-plied a two-point adjustment under U.S.S.G. § 3B1.1(c) because he was an organizer, leader, or manager in the criminal activity. The PSI further found that Camon committed the offense as a pattern of criminal conduct under U.S.S.G. § 4B1.3, which meant that his offense level could not be lower than 11 and that his adjusted of-fense level of 17 was unchanged. Finally, the PSI decreased Camon's offense level by three points pursuant to U.S.S.G. §§ 3E1.1(a), (b), for a total offense level of 14.

Based on a criminal history score of 3, Camon's criminal his-tory category was II, yielding a guideline imprisonment range of 18 to 24 months for his wire fraud conviction. The statutory max-imum penalty was 20 years imprisonment. As to the revocation of Camon's supervised release, the PSI calculated a guideline impris-onment range of 4 to 10 months based on a finding that Camon's offense of conviction was a Grade B violation under U.S.S.G. § 7B1.1(a)(2) and that his criminal history category was I at the time of the original sentence.

Camon raised various objections to the PSI, which were largely based on the inclusion of the alleged EIDL fraud and other

uncharged conduct as relevant conduct. He also objected specifically to the PSI's inclusion of references to the additional loss amount stemming from his alleged EIDL fraud. He also objected to the proposed application of U.S.S.G. §§ 2B1.1(b)(10)(C), 2B1.1(b)(12), 3B1.1(c), and 4B1.3 based on the EIDL fraud and other uncharged conduct.

Camon filed a motion to enforce the written plea agreement in which he argued that the government had breached the plea agreement by supporting the inclusion of the uncharged conduct in the PSI. He pointed to the stipulation that, "for purposes of relevant conduct used for calculating" his guideline sentencing range, he was "accountable for an intended fraud loss totaling []$19,452," and argued that it barred the government from advocating for the inclusion of the EIDL fraud and other uncharged conduct in the PSI, as it supported a greater loss amount. He also pointed to statements by the government during plea negotiations that, in exchange for a plea of guilty to wire fraud and revocation of supervised release, the government would "forego charging Camon on the EIDL/PPP/pandemic or counting any loss amount as relevant conduct" and that "with no relevant conduct from the [EIDL] loans, he is looking at a likely a Offen[s]e Level of 12 before acceptance on the new charge." He also contended that the government provided the probation office with evidence of the uncharged conduct recounted in the PSI.

Camon attached several exhibits to his motion. The exhibits included email exchanges with the government regarding plea

negotiations, which included the statements by the government regarding relevant conduct that Camon referenced in his motion. The exhibits also included email exchanges with the probation officer who prepared Camon's PSI, in which the probation officer stated that, with respect to the inclusion of the uncharged EIDL fraud, he "relied on the documents . . . provided by the government, as well as [his] discussions with" the government's counsel and the assigned law enforcement agent.

The government responded that its conduct was consistent with the terms of the plea agreement because the agreement was unambiguous, the stipulation concerned only a single offense characteristic, and the agreement "neither explicitly nor implicitly" prevented the government from advocating other specific offense characteristics or offense-level adjustments. The government also contended that, because the agreement was otherwise silent, it had not relinquished its ability to provide evidence of Camon's relevant conduct to the district court and that the emails Camon pointed to could not be considered when the plea agreement was unambiguous and contained a merger clause. The probation officer prepared a revised PSI, which removed the previous reference to U.S.S.G. § 4B1.3 and contained minor changes not relevant to this appeal but retained all references to Camon's alleged EIDL fraud and other uncharged conduct.

At the combined sentencing and revocation hearing, the district court began by addressing Camon's motion to enforce his plea agreement and admitted the exhibits he attached to the motion.

After hearing argument from Camon and the government, the district court denied the motion, concluding that Camon's interpretation of the plea agreement was "an attempt to improperly restrict the discretion of the Court." The district court explained that interpreting the plea agreement to bar the government from providing probation—and by extension, the sentencing court—with information relating to the uncharged conduct would amount to artificially and impermissibly restricting the universe of relevant conduct on which the court was permitted to base its sentencing decision.

The government then presented evidence of Camon's alleged EIDL fraud and the other uncharged conduct contained in the PSI. The government stated that it would stand by its stipulation that Camon was responsible for a total intended loss of $19,452 based on the unemployment fraud, and did not argue for a greater loss amount based on the EIDL fraud. The district court found that Camon engaged in EIDL fraud as relevant conduct and overruled his objections to the sentencing enhancements. The district court further ordered that the PSI be amended to remove references to the loss amount of $97,400 based on the EIDL fraud, and found that the loss amount was $19,452.

The district court accepted the plea agreement, adopted the PSI's guidelines calculation, and found that Camon's guideline range was 18 to 24 months on his wire fraud conviction, and 4 to 10 months on his supervision revocation. The government requested a sentence of 18 months for wire fraud, followed by 4

months on the supervision revocation. Camon requested a sentence of no more than 22 months. The district court sentenced him to 36 months imprisonment followed by 3 years of supervised release for wire fraud. It then revoked his supervised release and sentenced him to a consecutive 36 months imprisonment, for a 72-month total sentence.

The district court entered judgment in both cases. This appeal followed.

## II.    STANDARD OF REVIEW

We review whether the government breached a plea agreement *de novo*. *United States v. Tripodis*, 94 F.4th 1257, 1261 (11th Cir. 2024).

## III.    ANALYSIS

The government is "bound by any material promises it makes to a defendant as part of a plea agreement that induces the defendant to plead guilty." *United States v. Taylor,* 77 F.3d 368, 370 (11th Cir. 1996). Whether the government breached a plea agreement depends on the scope of its promises. *Id.* When a term in the plea agreement is disputed, we apply an objective standard to "decide whether the government's actions are inconsistent with what the defendant reasonably understood when he entered his guilty plea." *United States v. Copeland*, 381 F.3d 1101, 1105 (11th Cir. 2004) (quoting *In re Arnett*, 804 F.2d 1200, 1202–03 (11th Cir. 1986)). Further, while plea agreements are interpreted similarly to contracts, we do not apply a "hyper-technical" or "rigidly literal approach" to interpretation. *Tripodis*, 94 F.4th at 1261 (quoting *United*

*States v. Jefferies*, 908 F.2d 1520, 1523 (11th Cir. 1990)).  We construe ambiguous plea agreements against the government and will consider extrinsic evidence to clarify any ambiguity.  *Id.*

On appeal, Camon argues that the government breached the plea agreement by providing the information in the PSI concerning the alleged additional fraud and supporting its inclusion as relevant conduct for sentencing.  Camon contends that the government's actions controverted the plea agreement's stipulation that "for purposes of relevant conduct used for calculating the advisory sentencing range…Camon is accountable for an intended fraud loss totaling []$19,452" and conflicted with the government's representations during plea negotiations that the PSI would not include "relevant conduct from the [EIDL] loans."  Per Camon, the stipulation, coupled with the government's other representations, led him to reasonably conclude that the government was precluded from advocating that it had sufficient evidence to prove that Camon engaged in additional fraud that would support a loss amount greater than the one stipulated.

We are bound to adhere to our prior panel precedent unless that precedent has been abrogated by this Court sitting *en banc* or by the Supreme Court.  *United States v. Lightsey*, 120 F.4th 851, 860 (11th Cir. 2024).  Here, our precedent in *United States v. Boatner*, 966 F.2d 1575 (11th Cir. 1992), requires agreement with Camon's position.

In *Boatner*, we held that the government breached a plea agreement where it stipulated to a two-ounce quantity of cocaine

for sentencing purposes, but the probation officer subsequently prepared a PSI, based on information provided by the government, asserting that the defendant had participated in activities involving almost three kilograms of cocaine. *Id*. at 1577–79. Even though the government stood by its stipulation at sentencing, we explained that it breached the plea agreement by introducing evidence of the larger quantity of cocaine through the PSI and attempting to "bolster" the report at the sentencing hearing by discussing the additional evidence. *Id*. at 1579. In so holding, we accepted the defendant's argument that the government breached the agreement by introducing evidence that "could have lead [sic] the court to believe that he had been involved with almost three kilograms of cocaine." *Id*. at 1578.

The circumstances here are analogous to *Boatner* and require the same result. Construing the plea agreement's stipulation and the negotiation representations against the government, *Tripodis*, 94 F.4th at 1261, the government breached Camon's plea agreement by agreeing to a stipulated loss amount and then introducing evidence that could have led the district court to believe that Camon was accountable for a greater loss amount.

The government argues that the plea agreement did not expressly prohibit using uncharged conduct (such as the additional fraud allegations) to advocate for sentencing enhancements generally; it only precluded the government from advocating for a loss amount greater than the one stipulated. But accepting the government's contention would require adopting the kind of "hyper-

technical" and "rigidly literal" approach to the interpretation of plea agreements that our caselaw eschews. *See Tripodis*, 94 F.4th at 1261 (quotation omitted).

Here, we conclude that the government breached the plea agreement under *Boatner*. Camon's plea agreement stipulated that, "for purposes of relevant conduct used for calculating" his guideline range, he was "accountable for an intended fraud loss totaling []$19,452" stemming from the unemployment fraud. (Doc. 34 at 9). By providing probation with evidence of Camon's additional, uncharged conduct, including the EIDL fraud, and then presenting evidence of that conduct during sentencing, the government introduced evidence that could have led the district court to believe he was accountable for an additional loss amount of $97,400. This situation is analogous to *Boatner*, where the government breached the plea agreement by introducing evidence that could have led the district court to believe the defendant's conduct involved a greater drug amount than the one stipulated to in his plea agreement. *Boatner*, 966 F.2d at 1577-79. And, as in *Boatner*, the fact that the government in this case stood by its stipulation regarding the loss amount does not cure the breach where it introduced evidence of a greater loss amount via the PSI and at sentencing. *Id.* at 1579; (*see* doc. 65 at 138). The fact that the district court ordered that the PSI be revised to omit any reference to the loss amount stemming from Camon's uncharged conduct does not cure the government's breach either, because the evidence of uncharged conduct still *could* have supported the greater loss amount. *Boatner*, 966 F.2d at 1577-79; (*see* doc. 65 at 138-39). Additionally, the written plea agreement

in this case does not contain a clause in which the government reserved the right to disclose additional evidence to the court beyond evidence relating to Camon's unemployment fraud. *See United States v. Horsfall*, 552 F.3d 1275, 1282-83 (11th Cir. 2008).

Construing this evidence of the plea agreement's terms against the government, *see Tripodis*, 94 F.4th at 1261, leads us to conclude that Camon reasonably believed that his plea agreement precluded the government from introducing evidence of any other uncharged conduct that would contradict the stipulated loss amount. *See Copeland*, 381 F.3d at 1105 (government breached a plea agreement where its actions were inconsistent with what the defendant "reasonably understood" when entering his guilty plea).

When we find that the government has breached a plea agreement, we may: (1) order specific performance of the plea agreement, which requires vacating the sentence and remanding for resentencing before a different judge; or (2) allow the defendant to withdraw the plea. *Santobello v. New York*, 404 U.S. 257, 262–63 (1971). Camon requests the former. We therefore vacate his sentence and remand for resentencing before a new judge.

**VACATED AND REMANDED.**